Kingsley Arms Inc., Plaintiff,

against
Kirchhoff-Consigli Construction Management, LLC and FEDERAL INSURANCE COMPANY, Defendants.


900117-15

APPEARANCES:
Mastropietro Law Group, PLLC
Attorneys for Plaintiff
(John Mastropietro and Eric W. Gentino, of counsel)
63 Franklin Street
Saratoga Springs, New York 12866
Hinckley, Allen & Snyder LLP
Attorneys for Defendants
(James J. Barriere and Nathan R. Sabourin, of counsel)
30 South Pearl Street, Suite 901
Albany, New York 12207


Richard M. Platkin, J.

Plaintiff Kingsley Arms Inc. ("Kingsley") commenced this commercial construction action in February 2015, seeking to recover $208,000 from defendant Kirchhoff-Consigli Construction Management, LLC ("Consigli") and Federal Insurance Company ("Federal").[FN1]
 The claim arises from remediation work that Consigli, the general contractor, directed Kingsley, a sub-contractor, to perform in or about September 2014.
Following the completion of extensive fact discovery, a trial was held before the undersigned on November 8, 9 and 13, 2017. The Court heard the testimony of nine witnesses and received about 50 documents into evidence. Post-trial briefing was completed on February 16, 2018. Based on the credible testimony and evidence adduced at trial, the Court hereby makes [*2]the following findings of fact and conclusions of law.
BACKGROUND
In December 2010, Consigli was awarded a contract with the State University Construction Fund ("SUCF") for the general construction services required to build a new business school at the SUNY Albany uptown campus ("Project") (Ex. A). As required by its prime contract, Consigli procured a payment bond for the protection of its subcontractors and suppliers (Ex. 7).
On March 28, 2011, Kingsley entered into a written subcontract with Consigli to perform the site work for the Project, including the installation of about 920 feet of underground stormwater drainage piping (see Ex. 4 ["Subcontract"]). All work, labor and materials furnished by Kingsley pursuant to the Subcontract were to be "in complete accordance with the General Construction Documents" (id., article 1[A]), including the specifications prepared by SUCF's design consultant, Watts Architecture & Engineering ("Watts") (see Ex. 1). Kingsley guaranteed its work from defects in materials or workmanship for a period of one year from final acceptance (Subcontract, article 10).
In or about Spring 2013, flooding was discovered in one of the buildings adjacent to the Project site. SUCF investigated and discovered that a section of the new pipe had become deformed. After a series of discussions between the parties, Consigli directed Kingsley to repair the damaged pipe, and Kingsley complied ("2013 Repair").[FN2]

In the Summer of 2014, after the Project was completed, a routine video inspection of the drainage system revealed that a different segment of pipe was not installed at the specified slope and that another portion of the pipe had failed. SUCF's engineer notified Consigli of the problems on July 29, 2014 (Ex. 13); SUCF directed Consigli to replace the failed pipe on August 12, 2014 (Ex. 14); and Consigli issued the same directive to Kingsley on August 25, 2014 (Ex. 15).
Kingsley took the position, with support from Consigli, that the defects observed on video inspection were caused by the over-pressurization of the drainage system, which resulted from the designer's failure to properly account for the volume of stormwater draining through the system (Exs. 20-21). To preserve its rights and remedies against SUCF, Consigli submitted a notice of claim and verified statement on August 18, 2014 (Exs. 17 and 18).
SUCF was unconvinced by Kingsley and Consigli's over-pressurization theory and, instead, believed that the drainage system had not been properly installed. Representatives of SUCF, Consigli and Kingsley met to discuss the issue, and they ultimately agreed that the damaged section of pipe would be excavated and inspected, and a determination as to responsibility for the remediation costs would be made based on the results of the inspection.
The defective pipe was excavated and replaced in September 2014 ("2014 Repair"). SUCF hired MJ Engineering and Land Surveying, P.C. ("MJ Engineering") to observe this work and report on the condition of the existing system (see Ex. 25 ["MJ Report"]). The system's designer, Watts, also observed the remediation work and issued a report to SUCF (Ex. K ["Watts [*3]Report"]).
In total, seven sections of 15-inch diameter drainage pipe were replaced. Each section was a continuous 20-foot pipe, except for the seventh section, which had been field spliced by Kingsley. Thomas Bayly, a founder and vice-president of Kingsley who served as its Project superintendent, testified that this section of pipe had been struck by an excavator during installation, and Kingsley made a field splice to replace the damaged portion.
After reviewing the reports of its consultants, SUCF determined that the damaged pipe had not been installed in accordance with the plans and specifications and, therefore, refused to pay for the remedial work. Consigli adopted a similar position, while preserving its rights against SUCF in the event that the design of the system were determined to be defective (see Exs. 15, 19; see generally Transcript, pp. 337-342).
ANALYSIS
Kingsley contends that the remedial work performed in September 2014 resulted from a defective design of the drainage system and was not attributable to any deficiencies in its installation of the system. Consigli disagrees, arguing that Kingsley did not install the stormwater drainage system in accordance with applicable specifications and that Kingsley failed to prove that the design of the drainage system was defective. 
For the reasons that follow, the Court concludes that Kingsley has neither demonstrated its own compliance with the Subcontract (including the design specifications) nor proven its claim of a defective design by a preponderance of the credible evidence.[FN3]

A. Kingsley's Performance of the Work
The Court finds that Kingsley has failed to demonstrate its own compliance with the Subcontract as to at least three issues highly pertinent to its claim.
1. The Field Splice
The proof at trial establishes that Kingsley did not comply with the Subcontract in responding to the accidental damage of a 20-foot section of pipe during the sewer installation.
Thomas Bayly testified that Kingsley cut out the damaged segment of pipe and "spliced" in a new segment. However, the specifications clearly required Kingsley to "[r]eplace defective piping using new materials" (Ex. 1, Section 33 41 00 [Storm Utility Drainage Piping], § 3.10 [A] [3]). Further, Thomas Bayly acknowledged that he did not consult the pipe manufacturer's recommendations before deciding to perform the field splice rather than replace the damaged pipe.
With respect to the manner in which the splice was performed, Kingsley emphasizes that visual inspection of the pipe following excavation showed that the splice appeared to be intact with the metal bands still in place (see Exs. 27B, 27C). Kingsley also observes that neither SUCF's consultants nor Consigli's trial witnesses offered any specific criticism as to the manner in which the splice was implemented (see e.g. MJ Report, p. 9). And Thomas Bayly, who has decades of experience with pipe installation, testified that his decision to splice and the manner in which the splice was performed were consistent with industry standards (see Transcript, pp. [*4]17, 36, 70-72).
However, Michael Panichelli, the president of MJ Engineering, did question at trial whether the splice was performed in accordance with pipe manufacturer's recommendations (see Ex. E), as required by the Project specifications (see Ex. C, note A). On this point, Thomas Bayley testified that Kingsley did not consult the manufacturer's recommendations before performing the splice, and he could not say whether the splicing method he used was an approved one (Transcript, p. 66).
More fundamentally, MJ Engineering found that "[t]he failure of the field splice is evident from the CCTV video," which showed "debris hanging from the opening in the splice" (id., pp. 9-10). Thus, Panichelli testified that the vegetation matter observed inside the pipe in the vicinity of the splice was clear visual confirmation that the splice had failed. Panichelli drew further support for this conclusion from the apparent exfiltration of water in the vicinity of the splice, as well as the ground sagging immediately above the splice (Transcript, p. 297). To similar effect is the Watts Report (see pp. 2-3).
Thus, the credible evidence presented at trial establishes the failure of the field splice.
2. Trench Fill
The Watts Report states that exposed stone that appeared to be uncompacted was observed in the pipe bedding following the excavation (pp. 2-3). This observed lack of compaction was confirmed by Bradley Sendlack, a Watts engineer, who testified that Kingsley's failure to properly compact the stone left the drainage pipes without adequate structural support (Transcript, pp. 387, 443). Given the lack of adequate compaction, "[i]t is not surprising, then, that the stone had settled in a non-uniform manner, leaving the pipe improperly supported" (Watts Report, p. 3).[FN4]
 Accordingly, the Court finds that Kingsley failed to adequately compact the stone fill in accordance with the specifications.
3. Testing and Inspections
The third, and perhaps the most consequential, area of Kingsley's non-compliance concerns the testing and inspection requirements of the Subcontract. Before addressing the particulars of these requirements and Kingsley's non-performance, it is important to put the issue in its proper context.
Kingsley argues that neither the field splice nor the lack of adequate stone compaction were causes of the problems that led to the September 2014 remediation work. Kingsley maintains that the allegedly damaged splice is not a plausible explanation for the other observed problems with the drainage system, including: (i) a "squished joint" at the end of the same segment of pipe (Watts Report, Engineer's Daily Project Diary, September 26, 2014, p. 3); the fact that six 20-foot sections of pipe leading to the spliced pipe all had ends that were out of [*5]round (MJ Report, p. 5); and the "two-foot geyser situation" in the vicinity of the "northern most catch basin" that was observed on one occasion by Michael Winters, Consigli's project executive (see Ex. 21; Transcript, pp. 344-345). Kingsley further argues that no deficiencies in its stone compaction were contemporaneously observed by Consigl or identified in the testing and inspection reports prepared by others.
Thus, Kingsley asserts that the observed lack of compaction in the stone around the pipe, the deflection in the pipe ends over a span of 120 feet, the "geyser situation" and the pipe damage that necessitated the 2014 Repair all were caused by the same problem: a defective design that allowed the drainage system to become over-pressurized. According to Russ Reeves, a professional engineer who offered opinion testimony for Kingsley, it is this over-pressurization of the system that caused water to be forced out of the pipes at the joints, which undermined the pipe bedding and, ultimately, the integrity of the pipes themselves.
While the explanation put forward by Kingsley's expert is not without some appeal, it is predicated on the assumption that Kingsley properly installed the drainage system properly in the first instance. But the proof at trial shows that Kingsley failed to comply with its testing, inspection and record-keeping obligations under the Subcontract, thereby leaving it bereft of critical, contemporaneous proof as to this point.
In particular, Kingsley was obliged to inspect its work to determine whether line displacement or other damage to the pipe had occurred after about 24 inches of backfill was in place and again upon the completion of its work and to submit separate reports for each inspection (Ex. 1, Section 33 41 00-7, § 3.10 [A]). But Kingsley did not submit any inspection reports, and none of Kingsley's witnesses testified as to performing deflection testing, an express requirement of the specifications (see id., [A] [2] [b]).[FN5]
 In addition, the specifications require new piping systems to be tested for leaks and defects, but there is no indication that Kingsley or anyone else performed this testing (id., [B]).[FN6]
 
Thus, the Court finds that Kingsley failed to comply with its testing, inspection and reporting requirements under the Subcontract.[FN7]

[*6]4. Conclusion
Kingsley has failed to demonstrate that it complied with the Subcontract in responding to the accidental damage to the seventh section of pipe and with respect to the construction of the trenches upon which the drainage pipes were placed and supported. 
Taken together with Kingsley's failure to perform all of the testing and inspection required by the Project specifications, including deflection testing, and to document the testing and inspection that was performed, Kingsley also has failed to demonstrate that the drainage system was properly installed or that its deviations from the specifications did not cause or contribute to the damage giving rise to the 2014 Repair.
Finally, in the absence of proof that the drainage system was properly installed in the first instance, this is not a case where a defective design may be inferred based on the contractor's construction of the system in full compliance with plans and specifications.
B. Design of the Drainage System
The Court finds that Kingsley has not proven that the 2014 failure of the drainage system was caused by a defective design. In making the claim of defective design, Kingsley's expert, Russ Reeves, P.E., cited at least five deficiencies:
First, the Stormwater Pollution Prevention Plan ("SWPPP") prepared by Watts states that all of the soils at the Project site are Class A, which have a high infiltration rate and low runoff potential (Ex. 1, p. 11 and Attachment B). However, annexed to the SWPPP is a Geotechnical Report prepared by Dente Engineering, which characterized the soils at the site as Class C based upon 30 test borings (id., Geotechnical Report, pp. 3-5, 7). Because Class C soils are considerably more impervious to water than Class A soils, Reeves opined that the Watts Report over-estimated the quantity of stormwater that would be absorbed by the ground.
Second, Reeves testified that the design of the drainage system failed to adequately account for the runoff from adjacent areas. The SWPPP states that "[r]unoff from the areas adjacent to the site does not contribute to site runoff in the area; but the flow from the adjacent area does pass underneath the project site through existing storm drainage piping" (Ex. 1, p. 11). According to Reeves, there is substantial migration of water from east to west, and this flow of water overwhelmed an already over-taxed system. Reeves did acknowledge that a trench drain had been installed to address the runoff, but testified that some form of stormwater detention also was required.
Third, Reeves opined that the overall drainage requirements for the Project site were not properly calculated. He cites, among other things, preexisting drainage problems at the site.
Fourth, Reeves opined that the designer of the drainage system specified the wrong type of pipe. Specifically, Reeves testified that piping with water-tight joints should have been used [*7]to keep external water from infiltrating the system and to prevent pressured water from being pushed out of the pipe joints, which could cause deflection. Relatedly, Reeves opined that the pipe ends should have been wrapped in fabric to prevent soil migration and the movement of debris into interstitial spaces between the crushed stone.
Fifth, Reeves cites a variety of other conditions that are said to be indicative of a design defect, including: (i) the presence of a "choke point," where a 15" pipe opens to 24" pipe but later feeds back into a 15" pipe; (ii) the subsequent remediation measures allegedly undertaken by SUCF; (iii) a 2008 report that allegedly demonstrates pre-existing drainage problems at the site; and (iv) the marginal slope of the pipe, which was not adequate to move stormwater through the pipes.
Based on the foregoing, Reeves opined that "it is readily apparent that the total net tributary drainage areas and hence stormwater volume had been underestimated" and that the "pipe specification and overall drainage conditions at the site was problematic and the actual cause of the pipe failure" (Ex. 34, p. 3).
The fundamental problem with this conclusion, however, is that Reeves never performed his own calculations of the volume of expected stormwater or the drainage capacity of the system. Reeves "surmise[s]" that a capacity analysis performed with recognition of the soils as Class C and with full account taken of the runoff from other buildings and the existing drainage infrastructure would have called for the installation of a larger-capacity drainage system (Transcript, p. 213), but Reeves did not use the Manning Equation to calculate the rate or velocity of the flow of stormwater or perform a hydrologic analysis of the system, claiming that it was unnecessary for him to perform these calculations (id., pp. 210-214).[FN8]
 Thus, while Reeves may well be correct that errors in the soil type and runoff quantities adversely affected the design of the drainage system to some unspecified degree, there simply has been no persuasive showing that the capacity of the drainage system was inadequate to meet expected inflow using methods generally accepted in the field of civil engineering.[FN9]

Moreover, Reeves's conclusions appear to be affected by a number of factual misunderstandings on his part. He did not appear to be familiar with the first phase of the Project, in which three underground detention facilities were added to the stormwater drainage system; he relied upon a November 2008 capacity assessment report as proof of preexisting drainage problems without understanding that the report was prepared for the entire SUNY Albany campus; and Reeves relied upon subsequent remedial measures allegedly undertaken by SUCF with respect to stormwater management that were not the subject of adequate proof at [*8]trial.
Further, the Court finds that Reeves's opinions place excessive and unwarranted weight upon two observed instances of flooding. In particular, Michael Bayly testified that he observed one instance of water flowing back out of the drainage system, but that was prior to the 2013 Repair (Transcript, p. 124). Likewise, Michael Winter testified that he observed one instance of flooding prior to the 2014 Repair (Transcript, pp. 344-345). In contrast, no witness at trial observed, or was aware of, any similar flooding since the completion of the 2014 Repair more than three years prior to trial (see Transcript, pp. 124, 286, 303, 402-403).
Finally, Reeves has not demonstrated that relevant professional standards required the use of piping with water-tight joints under the conditions presented by the Project. In fact, the MJ Report specifically observed that, with the exception of the spliced section, all pipe joints appeared to be intact (p. 4), a finding that also is at odds with Reeves's theory of over-pressurization. Relatedly, while Kingsley argues in its post-trial reply memorandum that "properly fitted joints will always appear intact when not under pressure" (p. 8), Kingsley has not supported that contention by reference the trial record.[FN10]

In sum, the Court finds that the equivocal and largely circumstantial proof adduced by Kingsley and its expert is insufficient to carry its burden of demonstrating to a reasonable degree of professional certainty that the drainage system would have failed even if installed in full conformance with the Project specifications (cf. Village of Endicott v Parlor City Contr., Co., 51 AD2d 370 [3d Dept 1976]).
ATTORNEY'S FEES
Consigli seeks an award of attorneys' fees pursuant to Article 16 (C) of the Subcontract, which reads as follows: "In the event [Consigli] is a party to any legal proceeding on account of any acts or conduct of [Kingsley], [Kingsley] agrees to pay [Consigli] all reasonable expenses including attorney's fees incurred in connection with the legal proceeding."
The request for attorneys' fees is denied. Consigli's claimed entitlement to a fee award arises strictly from the terms of the Subcontract, but Consigli did not allege a counterclaim for such relief or move at any time for leave to amend its answer. Further, it would be highly prejudicial for the Court to award Consigli judgment on a claim that was neither pleaded nor raised at trial.[FN11]

CONCLUSION
Kingsley's theory of the case certainly is not implausible and finds some support in the trial record. Nonetheless, given Kingsley's lapses in compliance with the construction specifications, its failure to perform all of the testing and inspections required under the Subcontract, the absence of contemporaneous reports documenting the testing and inspections that Kingsley performed, the largely circumstantial proof of a design defect, the absence of a [*9]capacity/ requirements analysis performed in accordance with professional engineering standards supporting the claim of over-pressurization, and the various other weaknesses in plaintiff's expert proof cited above, the Court is unable to assign responsibility for the 2014 Repair to anyone other than Kingsley. 
In sum, viewing the trial record as a whole, Kingsley has not established its claim against defendants by a fair preponderance of the credible evidence. It is therefore

ADJUDGED and DECREED that Kingsley's complaint is dismissed in all respects, without attorneys' fees, costs or disbursements.

This constitutes the Decision & Judgment of the Court. The original Decision & Judgment is being transmitted to the Albany County Clerk for electronic filing and entry. Upon such entry, defendants' counsel shall promptly serve notice of entry on all other parties to this action (Uniform Rules for the New York State Trial Courts [22 NYCRR] § 202.5-b [h] [1], [2]). Further, the parties shall retrieve their original trial exhibits from Chambers within twenty (20) days; otherwise, they will be discarded.
Dated: Albany, New York
April 18, 2018
RICHARD M. PLATKIN
A.J.S.C.



Footnotes

Footnote 1: Kingsley's complaint also sought the recovery of $37,713 in withheld retainage, but this claim was withdrawn at trial (Transcript, p. 15).

Footnote 2: For the reasons stated on the record, the Court granted defendants' motion in limine to preclude Kingsley from pursuing at trial any claim for damages arising from the 2013 Repair (see Transcript, pp. 10-14).

Footnote 3: In view of these conclusions, the Court need not consider defendants' alternative contention that Kingsley's claims are barred by its failure to comply with the contractual notice-of-claim requirements.

Footnote 4: The record further establishes that Kingsley used incorrect fill materials in certain areas. The specifications required Kingsley to use engineered fill "[u]nder walks and pavements" (Ex. 1, Section 31 20 00-7, § 3.10 [B] [2]). However, Thomas Bayly conceded that excavated trench fill, rather than engineered fill, was used under sidewalks (Transcript, p. 62; see also Ex. 1A), and Michael Bayly confirmed that trench fill was used throughout the Project (id., p. 129). Nonetheless, Consigli's witnesses did not establish any linkage between the use of incorrect fill under the sidewalks and the 2014 Repair (see MJ Report, p. 8; Transcript, pp. 443, 462-463).

Footnote 5: Thomas Bayly did testify in some detail as to testing the new drainage pipe for alignment and grade using a laser (Transcript, pp. 31-32, 67).

Footnote 6: There is some lack of clarity associated with the latter testing requirement. Under the specifications, "[t]ests and inspections not explicitly assigned to the Owner are the Contractor's responsibility" (Ex. 1, Section 01 40 00-7, § 1.9 [B]), and there is nothing in the specifications that specifically assigned responsibility for testing the new piping system to SUCF. However, Consigli's project manager, Jay Quackenbush, testified that he did not believe that Kingsley was required to test its own pipe. In contrast, the specifications clearly and unequivocally obliged Kingsley, as the contractor performing the installation of the drainage system, to perform the field inspections called for under Section 3.10 (A), a reading that comports with Kingsley's own contemporaneous understanding (see also Transcript, p. 58).

Footnote 7: The Court recognizes that Consigli, the construction manager and third-party inspectors retained by SUCF did perform some monitoring and inspection of Kingsley's work and did not report problems with the field splice or the lack of adequate stone compaction. However, the presence of these additional layers of oversight does not excuse Kingsley's failure to perform the testing and inspections required by the Subcontract. Moreover, in assessing the weight of the evidence (see infra), the Court chooses to accord greater weight to the opinions formed by those who observed the defective segments upon excavation and, in fact, the Court heard very limited testimony regarding the manner in which Kingsley's work was tested and inspected by others prior to completion.

Footnote 8: In contrast, the SWPPP is supported by hundreds of pages of detailed hydrological calculations (see Ex. 1).

Footnote 9: The Court similarly is unpersuaded by Kingsley's reliance on the testimony of Bradley Sendlack stating that Watts did not take in account the capacity of the existing system into which the new system drained (Transcript, pp. 411-413). In the Court's view, it is not enough to demonstrate that the designer failed to adequately consider a particular issue; the proponent of the defective design claim also must establish the changes to the design that would have resulted from proper consideration of the issue.

Footnote 10: The Court rejects Kingsley's contention that it was incumbent upon defendants to adduce expert proof establishing that pipe joints do not re-seat themselves after over-pressurization episodes.

Footnote 11: As Kingsley observes, it was precluded from pursuing recovery at trial for the 2013 Repair for essentially the same reasons (see Transcript, pp. 11-12).